IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**Circuit Court Case No. 22-55517**

LUCINE TRIM, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

PLAINTIFF-APPELLANT,

V.

REWARD ZONE USA LLC, *ET. AL*.

DEFENDANT-APPELLEE.

## OPENING BRIEF FOR PLAINTIFF-APPELLANT LUCINE TRIM

APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT CASE NO.: 2:20-CV-01027-SVW-KS
(HONORABLE STEPHEN V. WILSON)

**LAW OFFICES OF TODD M. FRIEDMAN**
Todd M. Friedman, Esq. (SBN 21675)
Adrian R. Bacon Esq. (SBN 280332)
Thomas E. Wheeler (SBN 308789)
21031 Ventura Blvd, Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
Email: tfriedman@toddflaw.com

*ATTORNEYS FOR APPELLANT*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...............................3

STATEMENT OF THE CASE ................................................................4

STATEMENT OF FACTS ......................................................................9

  I. Trim's Allegations ........................................................................9

  II. The District Court's Order Dismissing the 47 U.S.C. § 227(b) Claims
  Without Leave to Amend .................................................................17

SUMMARY OF THE ARGUMENT .......................................................21

STANDARD OF REVIEW ..................................................................23

ARGUMENT ...................................................................................25

  I. Trim Alleged a Plausible Claim that Reward Zone Used an ATDS to Place
  Calls to her Cellular Telephone.........................................................25

    A. What Is A Random Or Sequential Number Generator? .......................26

    B. The District Court Misapplied *Facebook's* ATDS Test .........................29

    C. The District Court's Ruling Conflicts with the Plain Language of the
    Statute and Ignores Half of the Supreme Court's Test .............................34

    D. Legislative History and FCC Rulings Support Predictive Dialers Being
    an ATDS, and SMS Blasters are Programmed Using the Same Number
    Generator Functions......................................................................39

    E. The District Court Erred Procedurally by Failing to Accept Plaintiff's
    Allegations as True .......................................................................46

  II. Trim's Complaint Alleges Use of an Artificial and Prerecorded Voice ...49

    A. Voice is an Ambiguous Term................................................................51

**CONCLUSION**.................................................................................**57**

**STATEMENT OF RELATED CASES**....................................................**59**

**CERTIFICATE OF COMPLIANCE PURSUANT TO**..................................**60**

**CERTIFICATE OF SERVICE** ............................................................**61**

# TABLE OF AUTHORITIES

## Cases

7 FCC Rcd. 8752 (F.C.C. September 17, 1992) ........................................ 42, 43, 55

*Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620 (5th Cir. 2013) .......................35

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ............................................. 23, 46

*Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737 (6th Cir. 2013) .....................................................................55

*Atkinson v. Pro Custom Solar LCC*, No. SA-21-CV-178-OLG, 2021 WL 2669558 (W.D. Tex. June 16, 2021).............................................................. 44, 48

*Barnett v. Bank of America*, 2021 WL 2187950 (W.D.N.C. May 28, 2021) ..........46

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..................................... 23, 24

*Bell v. Portfolio Recovery Assocs., LLC*, No. 5:18-CV-00243-OLG, 2021 WL 1435264 (W.D. Tex. Apr. 13, 2021)......................................................48

*Callier v. GreenSky, Inc.*, 2021 WL 2688622 (W.D. TX May 20, 2021) ..............45

*Caplan v. Budget Van Lines, Inc.*, No. 220CV130JCMVCF, 2020 WL 4430966 (D. Nev. July 31, 2020)................................................................56

*Carolina Cas. Ins. Co. v. Team Equipment, Inc.*, 741 F.3d 1082 (9th Cir. 2014). 24, 48

*Corley v. United States*, 129 S.Ct. 1558 (2009).........................................35

*Duguid v. Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019).........................................5

*Duncan v. Walker*, 533 U.S. 167 (2001).................................................39

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ........................................ passim

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).......................35

*Flores v. Adir International, LLC*, 685 Fed.Appx. 533 (9th Cir. March 24, 2017) .47

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) .................................56

*Garner v. Allstate Insurance Company*, 2021 WL 3857786 (N.D. IL Aug. 30, 2021) ....................................................................................... 45, 49

*Grome v. USAA Savings Bank*, No. 4:19-CV-3080, 2021 WL 3883713 (D. Neb. Aug. 31, 2021) ...........................................................................32

*Gross v. GG Homes, Inc.*, No. 3:21-CV-00271-DMS-BGS, 2021 WL 2863623 (S.D. Cal. July 8, 2021) .........................................................................48

*Hibbs v. Winn*, 542 U.S. 88 (2004) .........................................................35

*Jance v. Home Run Offer LLC*, No. CV-20-00482-TUC-JGZ, 2021 WL 3270318 (D. Ariz. July 30, 2021) .........................................................................49

*Jance v. Homerun Offer LLC*, 2021 WL 3270318 (D. AZ July 30, 2021)..............45

*Libby v. National Republican Senatorial Committee*, 551 F.Supp.3d 724 (W.D. TX July 27, 2021) ...............................................................................45

*MacDonald v. Brian Gubernick PLLC*, 2021 WL 5203107 (D. Az. Nov. 9, 2021) ....................................................................................................45

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008) 24, 46

*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006).........................................23

*Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) ...........................5

*Marriott v. National Mut. Cas. Co.*, 195 F.2d 462 (10th Cir. 1952) .......................56

*McEwen v. National Rifle Association of America*, 2021 WL 5999274 (D. ME Dec. 20, 2021) ...............................................................................45

*Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238 (2011) ...........................39

*Miles v. Medicredit, Inc.*, No. 4:20-CV-01186 JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021)..............................................................................48

*Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2012) ...........................................1

*Montanez v. Future Vision Brain Bank, LLC*, 536 F.Supp.3d 828 (D. Co. April 29, 2021) ......................................................................................44

*Montanez v. Future Vision Brain Bank, LLC*, No. 20-CV-02959-CMA-MEH, 2021 WL 1697928 (D. Colo. Apr. 29, 2021)........................................48

*Panzarella v. Navient Solutions, Inc.*, 37 F.4th 867 (3rd Cir. 2022) .......................40

*Poonja v. Kelly Services, Inc.*, 2021 WL 4459526 (E.D. IL, Sept. 29, 2021).........45

*Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51 (2nd Cir. 2017) .......56

*Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946 (9th Cir. 2009)............... 52, 57

*Timms v. USAA Federal Savings Bank*, 543 F.Supp.3d 294 (D. SC June 9, 2021) 46

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ...............................................................35

*Van Buren v. United States*, 141 S.Ct. 1648 (2021) ...............................................18

*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017) ... 37, 56

*Vance v. Bureau of Collection Recovery LLC*, No. 10 C 6324, 2011 WL 881550 (N.D. Ill. Mar. 11, 2011)........................................................................49

**Statutes**

28 U.S.C. §1331 ........................................................................................................1

Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq........................ passim

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (3d ed. 2004) ......................................................................................24

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (1st ed. 2012) .........................................................................35

Hearing Before the Subcommittee on Communications of the Committee on Commerce, Science and Transportation, United States Senate One Hundred Second Congress First Session July 24, 1991, Testimony of Robert Bulmash ...43

**Rules**

Fed. R. App. P. 4 ..............................................................................................2

Fed. R. Civ. P. 12(b)(6) .................................................................................23

Fed. R. Civ. P. 54 ............................................................................................1

**Regulations**

47 C.F.R. §§ 64.1200 ....................................................................................43

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014 (2003) .............................. 12, 41

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559 (Jan. 4, 2008) ............................................................37

*In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015).......................................................................42

# JURISDICTIONAL STATEMENT

The United States District Court for the Central District of California had federal question jurisdiction under 28 U.S.C. §1331, *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 753 (2012). In her Third Amended Complaint, appellant Lucine Trim ("Trim") alleged four causes of action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"). (ER 101-119.)[1]

This appeal is from the January 28, 2022 order of the District Court partially granting Reward Zone's motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] Trim's claims under 47 U.S.C. § 227(b) were dismissed with prejudice. (ER-22—31.) Her claims under 47 U.S.C. § 227(c) were dismissed with leave to amend. Trim amended and Reward Zone has filed an answer to a fourth amended complaint. Accordingly, the District Court's July 15 order "[did] not end the action as to any of the claims or parties ...." *See* Fed. R. Civ. P. 54(b). However, on April 28, 2022, the Court granted Trim's unopposed motion to certify Plaintiff's 47 U.S.C. § 227(b) claims for partial judgment to permit this Appeal, pursuant to F.R.C.P. 54(b). (ER-6—9.)

---

[1] Citations to appellant Trim's Excerpts of Record are denoted "ER," followed by the page number.

[2] All subsequent references to rules will be to the Federal Rules of Civil Procedure, unless otherwise specified.

Thus, on April 28, 2022, the District Court's January 28, 2022 order became a final appealable order, giving this Court jurisdiction under 28 U.S.C. § 1291.  *See* Fed. R. Civ. P. 54(b).  Trim filed a timely notice of appeal on May 20, 2022.  (ER 120-121.)  *See* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the District Court err in granting Reward Zone's motion to under Rule 12(b)(6) when it concluded that Plaintiff did not allege facts sufficient to state a plausible claim?

2. Does the plain language of the TCPA's definition of Automatic Telephone Dialing System ("ATDS"), pursuant to 47 U.S.C. § 227(a)(1) and the Supreme Court's holding in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), require a plaintiff to allege that the "equipment must use a number generator to generate the phone numbers themselves" or can a plaintiff allege use of an ATDS by alleging that the equipment uses number generators to *either* store <u>or</u> produce telephone numbers to be called?

3. Whether the district court's granting of Defendant's motion, pursuant to F.R.C.P. 12(b)(6) violated the requirement that district courts must construe the complaint in the light most favorable to the plaintiff when deciding whether to deny a plaintiff the right to discovery?

4. Whether the district court's holding that Defendant's automated SMS blasting platform did not send messages to Plaintiff utilizing an artificial or voice, contravenes the definition of artificial voice as prohibited by 47 U.S.C. § 227(b)(1)(A)?

## STATEMENT OF THE CASE

On January 31, 2020, prior plaintiffs Tracy Eggleston and Monica Abboud filed a class action Complaint alleging that Reward Zone negligently and willfully violated the TCPA by sending to their cellular telephones and those of others similarly situated telemarketing text messages using an automatic telephone dialing system ("ATDS"). On April 20, 2020, Appellant Lucine Trim was added as an additional class representative to the lawsuit. For reasons unimportant to this appeal, prior plaintiffs decided not to pursue their claims, and only Trim remained. Trim's allegation was that solicitation text messages were blasted out *en masse* using an SMS blaster, which is a traditional campaign-based dialing platform that automatically sends thousands of text messages to thousands of people and was used in this fashion to automatically dial Trim. Trim further alleged that the SMS blaster was programmed with source code that relied upon number generators to both store and produce the telephone numbers that the system called. Plaintiff's complaint contained a specific example of such number generators used by an SMS blaster alleged to function similarly to the one used by Reward Zone. These telemarketing text messages were sent to consumers without prior express consent, as the lead vendor who sold Reward Zone Trim's (and others') contact information, laundered consumer contact information from other sources and misrepresented that obtained it through an organic opt in on its website in order to

manufacture consent leads, for the mutual profit of Reward Zone and Deal Zingo.[3] Thus, Reward Zone was mass-dialing thousands of consumers without consent, just as Congress intended to prohibit when enacting the TCPA.

The District Court erred by dismissing Trim's ATDS allegations. According to the District Court, the test for an ATDS required Trim to allege that "equipment must use a number generator to generate the phone numbers themselves." This is inconsistent with the Supreme Court's test, set forth in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ("*Facebook*"). In *Facebook*, the Supreme Court was asked to clarify a syntax dispute regarding whether the qualifying phrase "using a random or sequential number generator" applied to both the "store" and "produce" components of the TCPA's disjunctive ATDS elements. Under this Court's prior holdings,[4] the qualifying language was held to only modify the latter. The result was that any system which automatically dialed telephone numbers from stored lists was previously considered an ATDS, even if no number generators were coded into the dialer.

*Facebook* does not exclude the dialing software used to dial Trim, which *does* utilize number generators in the code to both store and produce the telephone

---

[3] Plaintiff is in possession of documents and data showing this to be true, but it must be assumed true for purposes of this Appeal, as it is plausibly alleged.

[4] *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018); and *Duguid v. Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019).

numbers to be called. Thus, the District Court's ruling contravenes the instructions of the Supreme Court, which observed that number generators could be used to _either_ store _or_ produce. According to the District Court, it must do something completely different – generate the telephone numbers themselves, even though the statute does not reference telephone number generation, and the Supreme Court did not include those words in its ruling.

Plaintiff alleged with detailed specificity exactly what the Supreme Court instructed a Plaintiff must allege for a dialing system to be an ATDS. These allegations were convincingly presented. The system used to call Trim operates and is programmed considerably differently than the system used by Facebook to dial Duguid. Facebook did not use an SMS blasting platform. Its system sent fraud alerts based on a one-to-one triggering event to a specific telephone number, when certain criteria instructed the dialing software to call that specific consumer. Trim received a mass-blasted marketing text message from an unknown company.

The District Court's ATDS ruling was flawed procedurally and legally. First, the District Court misapplied the Supreme Court's instructions in _Facebook_. Second, the District Court ignored Trim's allegations and incorrectly looked beyond the pleadings to determine the system was not an ATDS.[5] Trim plausibly

---

[5] How a District Court could do this without reviewing source code or hearing from experts about how the dialer relied upon number generators is unclear.

alleged the dialing software used random or sequential number generators to both store and produce telephone numbers to be called. These allegations should have been viewed in their light most favorable to allow for the right to discovery and a determination of the issue on the merits.

Trim alternatively alleged that the system used to automatically send her pre-drafted messages at a pre-scheduled time via SMS utilized an artificial voice. Trim requested judicial notice of the TCPA's legislative history which shows Congress prohibited artificial and prerecorded voice calls after expressing concerns with agentless communication devices, which it found particularly obnoxious and intrusive. There is no doubt the messages were artificial. The only question is whether the word "voice" is ambiguous and may encompass text-based forms of telephone communications.

The District Court found that voice must mean "sound produced by vertebrates by means of lungs, larynx, or syrinx; especially sound so produced by human beings" and ignored Plaintiff's alternative dictionary definitions of voice: "an instrument or medium of expression" and "to express in words." Voice can mean many things. Text messages have been interpreted by both this Court and the FCC to be calls under the the TCPA, which is a remedial statute and must be broadly construed. The written language of an SMS communication is simply the communicative counterpart to an oral communication through a phone call. If a

text is a call, then a text utilizes a voice. The District Court disagreed, finding Trim's argument "beyond the bounds of common sense." However, the District Court's narrow interpretation of voice suffers from many textual problems, including that artificial voices are, by definition, inorganic and are not "sounds produced by vertebrates by means of lungs, larynx, or syrinx." Artificial voices are sounds created by computer programs where text is converted into noise through software. Under the District Court's definition of "voice" there is no such thing as an "artificial voice" resulting in the term being mere surplusage. Moreover, because text messages are calls, under the District Court's reading, the TCPA would become inharmonious unless rewritten to carry different standards for texts and calls. The statute treats "any" telephone call as prohibiting artificial voices, presupposing such existence in all contexts. 47 U.C.S. § 47(b)(1)(A). Alternative definitions suffer from textualist problems. Trim's allegations of artificial agentless text messages satisfies both the letter and spirit of the law.

The District Court dismissed Trim's claims under Section 227(b) with prejudice. Trim filed a motion seeking leave to partially enter judgment and certify Trim's dismissed claims for appeal under F.R.C.P. 54(b). Trim filed a timely notice of appeal on May 20, 2022. (ER-120—121.)

///

///

## STATEMENT OF FACTS

### I. Trim's Allegations

Trim's Third Amended Complaint was filed November 15, 2021 and alleged individually and on behalf of those similarly situated that Reward Zone negligently and willfully contacted Trim on her cellular telephone in violation of sections 47 U.S.C. § 227(b)(1) and 47 U.S.C. § 227(c)[6] of the TCPA. (ER-101—119)

Trim's Section 227(b) allegations were that Reward Zone contacted her using an SMS blaster, which is an autodialer program that sends out text message blasts to large lists of telephone numbers without any manual dialing component. Trim alleged that Reward Zone obtained leads lists from vendors who did not obtain consumers' prior express consent, but instead laundered consumer data from other sources and misrepresented that it was obtained from a valid online opt in for Reward Zone's services. Trim was subject to non-consensual telemarketing text messages, in violation of her privacy and rights set forth under the TCPA.

Trim alleged that the SMS blaster used by Reward Zone was an ATDS under *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ("To qualify as an 'automatic telephone dialing system,' a device must have the capacity ***either*** to store a telephone number using a random or sequential generator ***or*** to produce a telephone number using a random or sequential number generator.") (emphasis

---

[6] Plaintiff's Section 227(c) claims were upheld and stayed pending this Appeal.

added). As the Supreme Court indicated, "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time." *Id.* at 1171-72 fn. 7.

On April 14, 18, and 19 of 2020, Trim received advertising/promotional text messages from Reward Zone on her cellular telephone number ending in -2347. The text messages sought to solicit its rewards services:



(ER-12—14.) The hyperlinks in the messages redirected Trim to Reward Zone's website, where she was informed how to purchase Defendant's services. *Id.*

Reward Zone did not have Trim's prior express consent to send her solicitation messages. Reward Zone obtained her contact information from lead vendor Deal Zingo. Deal Zingo laundered consumer contact information from other sources and sold it to Reward Zone under the guise that consumers visited its website and opted in to receive telephone solicitations, when this was not accurate. Trim further alleges that even if the opt in were not manufactured, the language on Deal Zingo's website does not comply with the FCC's telemarketing regulations regarding the requirements of obtaining legally valid prior express written consent for Reward Zone. (ER-105.)

Based on the content and format of the text messages, Trim alleges they were sent via Defendant's SMS Blasting Platform, which is an ATDS, as defined by 47 U.S.C. § 227 (a)(1) as prohibited by 47 U.S.C. § 227 (b)(1)(A). Trim alleges in detail that the ATDS "has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator," as set forth in *Facebook*. Trim's allegation is based on the following facts, alleged based on her personal knowledge, work product from her counsel in working with software engineers and reviewing source code of similar SMS blasting platforms as used by Reward Zone, and on information and belief:

> The text message sent to Plaintiff's cellular telephone was not sent by a live agent and thus created a one-sided conversation in which Plaintiff could not receive a response to her questions and/or

concerns. The text message also was sent in an automated fashion as a result of computerized campaigns that were preprogrammed in advance to send messages out to large groups of consumers all at once, either sequentially or via algorithmic dialing, i.e. in an automated fashion by a computer. By algorithmic dialing, Plaintiff means that the dialing platform is programmed in a manner which utilizes a random or sequential number generator in order to dial a stored list of numbers.

(ER-105—106.)

The texting platform uses an algorithm whereby a random or sequential number generator, similar to a randomization formula or sequential dialing formula, selects which number to dial from the stored list of numbers, and sequences those numbers in order to automatically dial the numbers and send our text messages en masse. Thus, a random or sequential number generator is used both to store the numbers, and to produce the stored numbers from the list, via the campaign, to the dialing platform itself.

*Id.*[7]

Undersigned counsel have studied the code used to program other similarly-functioning autodialers in the past, with the assistance of software engineers fluent in Java, and have found that such autodialers, when used in automated mode, execute code that relies upon random or sequential number generation to both store and

---

[7] Campaign-based SMS blasters operate virtually identically to traditional predictive dialers, in that they rely on number generators to both store and produce telephone numbers to be called by the platform. Predictive dialer functionality is described by the FCC. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 ¶¶ 8 fn 31, 131, and 146 (2003) ("2003 FCC Order"). If a predictive dialer being used in predictive dialing mode is treated legally as an ATDS, so too must an SMS blaster because they rely on similar number generation.

produce numbers to be dialed by the dialer. For instance,[8] a common "parser" used in SMS blasters integrates the following opensource Apache code into an autodialing dialing platform:

```
730 if (!this.recordList.isEmpty()) {
731 this.recordNumber++;[9]
732 final String comment = sb == null ? null : sb.toString();
733 result=newCSVRecord(this,this.recordList.toArray(Constants.E
MPTY_STRING_ARRAY), comment,
734 this.recordNumber, startCharPosition);
735 }
736 return result;
737 }
```

These lines of code, and specifically the "++" in line 731, represent an operator token that generates sequential numbers as part of a loop. This loop is used to select which number from the CSV file, will be dialed, and produce that number to the dialer using a CSV parser. Such programs can dial thousands of consumers in mere seconds, without any human intervention whatsoever.[10] The sequential number

---

[8] The dialer code showing this Parser is one example of number generators that are known to exist in dialer code and are used in both the storage and production of telephone numbers to be called by dialing systems. Trim does not have access to the source code for Reward Zone's dialing system, but alleges number generators were used in its system and gave one known concrete example of number generators used in SMS blaster dialer code. Her complaint should not be read to be limited to this particular example of code, but should be broadly construed, given that this code is illustrative.

[9] This is a sequential number generator from the programming code of an actual SMS blaster.

[10] Plaintiff is aware that human intervention is not the legal standard for whether a system is or is not an ATDS. However, a lack of human intervention, alleged at the pleading stage, strongly suggests a random or sequential number generator was used to store, or produce (or both) telephone numbers to be called by the dialer. Where human intervention is lacking, this leads to a strong inference that the system relies on number generation, from a pure software engineering perspective.

> generator in the code above is executed in the process of mass predictive dialing. The program cannot function, and therefore cannot dial any phone numbers at all, without this sequential number generator.

(ER-106—107.)

> Plaintiff alleges that Defendant used a dialing system with the similar capacity to autodial numbers as shown above. Functionally, that is simply how text blasting systems work. They rely on random or sequential number generators to instruct the data set to produce telephone numbers to the dialer. Without this key component, a dialing campaign would require an agent to manually place the call, through organic decision making, or as was the case in *Duguid v. Facebook*, through some other organic one-to-one triggering event that instructs the dialer to place the call.

(ER-107.)  Trim plausibly alleged that she would not be able to identify the specific number generator code in Reward Zone's dialer used to store and/or produced her telephone number to be called without access to discovery.  *Id*. Trim alleged with emphasis that any traditional text blasting platform, "*will have some variation on the coding that is described herein*, which will undoubtedly include either random or sequential number generators that are being executed in conjunction with storing and dialing the telephone numbers, including the dialing of Plaintiff's phone number."  (ER-108.)  Reward Zone spoofed its phone numbers, providing further plausibility that an ATDS was used.  (ER-107—108.)

Trim goes on to describe how campaign-based dialers typically operate:

---

Plaintiff made this allegation to ensure the District Court had more than bare bones allegations of the Supreme Court test.

A dialer operator accesses a database of consumer contact information, which is typically contained in a text delimited file, either in a CSV file, text file, Microsoft Excel, or Microsoft Access file. In essence, this is a spreadsheet, containing rows and columns of data, which includes telephone numbers. The operator will load this data set into the dialing platform. The dialing system will cut the data set into individual lines, unique to each telephone number with an assigned row using a parser. Parsers will separate the data, and then index the telephone numbers using either random or sequential number generators, but most commonly sequential number generators. The program will then store the telephone number using that number generator. The data is stored in temporary cache or RAM memory, to be accessed by the dialer platform thereafter. A random or sequential number generator is programmed to select and produce, automatically, without any organic triggering event by a human being, the telephone numbers, i.e. in accessing them from storage. Once the number generator corresponds to a matching number in the stored list, that telephone number will be "produced" from storage to the dialer, which then automatically dials that telephone number. Thus, predictive dialers have the capacity to use random or sequential number generators to both store and produce the telephone number to be automatically dialed by the dialing program, without human intervention.

(ER-108—109.) Trim alleges that such a system is capable of sending out thousands of messages "in the blink of an eye" with no manual human involvement beyond pre-programming the campaign parameters.

Trim alternatively alleges Reward Zone's dialing platform utilized "artificial voice" as prohibited by 47 U.S.C. § 227(b)(1)(A). Merriam Webster's Dictionary defines "voice" as "an instrument or medium of expression." It defines "artificial" as "humanly contrived…often on a natural model: MAN-MADE" and "lacking in natural or spontaneous quality."

The messages sent to Trim employed a text message as an instrument or medium of expression to deliver an automatic message drafted in advance of being sent, to convey a telemarketing communication. SMS blasting platforms are man-made humanly contrived programs which allow companies to blast out automated messages via non-spontaneous methods, similar to an assembly line in a factory. Such SMS blasting devices are incapable of spontaneity, as they must be programmed by the operator to automatically send messages out, *en masse*, pursuant to preprogrammed parameters.

The text message sent to Trim was set down in writing in advance by Reward Zone, whose employees wrote out the standard automated messages that were to be sent to Trim and other class members, and by way of preprogrammed SMS blasting, entered the artificial message into the SMS Blasting platform, and thereafter sent these messages pursuant to scheduled blasts that were programmed by Reward Zone. Thus, Reward Zone employed a text message as an instrument or medium of expression to deliver an artificial message.[11] (ER-109—110.)

Trim's core allegation is that agentless text messags are, from the perspective of legislative history, plain meaning, public policy, and regulatory

---

[11] Trim waives the argument that automated text messages are prerecorded voices for purposes of this appeal.

developments in SMS treatment since the enactment of the TCPA, the same thing as a call utilizing an artificial oral utterance.

## II. The District Court's Order Dismissing the 47 U.S.C. § 227(b) Claims Without Leave to Amend

The District Court dismissed Trim's 47 U.S.C. § 227(b) claims *without* leave to amend, finding the claims failed as a matter of law. (ER-22—31.) The District Court observed the standard for determination of whether dialing software constitutes an ATDS is whether it has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers." 47 U.S.C. § 227(a)(1). It went on to review *Facebook*, correctly summarizing its limited holding as follows:

> In proceedings below, the Ninth Circuit had held that this feature constituted an autodialer because it had the capacity to (1) store phone numbers, and (2) dial them automatically, notwithstanding the fact that a number generator (whether random or sequential) was not used. Id. In essence, the Ninth Circuit's view was that the requirement of using a number generator only applied to producing the phone number – not to storing it. Thus, equipment which merely stored and automatically dialed phone numbers without any use of a number generator still met the definition of an autodialer.
> The Supreme Court reversed, holding that the phrase "using a random or sequential number generator" modified both the words "store" and "produce." Id. at 1169-73. Accordingly, the Court held that to constitute an autodialer, a "necessary feature" was "the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." Id. at 1173.

However, rather than applying this test, which analyzes whether a dialing platform relies upon random or sequential number generators to either store or produce telephone numbers to be called, the District Court misinterpreted the word "produce"[12] and excised the words "store or" from the statute entirely creating a new test that is nowhere in the statute.[13] ER-26—27, (citing *District, Austria v. Alorica, Inc*., 2021 WL 5968404, (C.D. Cal. Dec. 16, 2021)).

The District Court found that "equipment is only an autodialer if it uses a number generator to generate the phone numbers themselves – not if the number generator is used merely to index the phone numbers or select phone numbers from that index." The TCPA defines an ATDS as "equipment that has the capacity— (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). For the District Court's Order to be consistent with the statute, an

---

[12] Miriam Webster's Dictionary's first definition of "Produce" is "to offer to view or notice." *Webster's Ninth New Collegiate Dictionary*, 938 (1991). Produce does not mean the same thing as "create" or "generate." Moreover "produce" is a technical computer science term, and the interpretation of its meaning should be viewed under the lexicon of computer science texts. *See Van Buren v. United States*, 141 S.Ct. 1648, 1657 (2021) (technical terms should be interpreted under their technical meaning).

[13] The District Court laid out four possible interpretations of an ATDS, none of which match the Supreme Court test. The District Court's analysis of these four possible interpretations was a false dichotomy, because it failed to include the actual test in its possible interpretations.

ATDS would need instead to be defined as "equipment that has the capacity—(A) to create telephone numbers to be called, using a random or sequential <u>telephone</u> number generator; and (B) to dial such numbers." This is not what the statute or the Supreme Court's interpretation of it say.

The District Court's erroneous ruling that dialing software must self-generate the telephone numbers it thereafter dials effectively results in nothing being an ATDS. There do not exist modern dialing platforms that operate in this manner, and such systems have not been used since the 1960s and were well out of fashion when the statute was passed in 1992.[14] Moreover, the self-generation requirement ignores the storage aspect of *Facebook*, as well as systems expressly described in its ruling which rely on number generators to index and automatically dial stored lists of phone numbers produced from storage to the dialer (like the system Trim alleged). Additionally, cannons of construction would reject a definition of ATDS that categorically excludes systems that dial stored lists of numbers, because such a holding would excise the statutory text regarding prior express consent from the statute. A consent requirement presupposes that an ATDS could dial stored lists of consenting consumers' telephone numbers, as

---

[14] The Supreme Court was aware of this when it issued its ruling, as the history of autodialers technology was presented before the Court in Amicus briefing in the *Facebook* case. ER-35—64.

dialing telephone numbers that were self-generated and did not come from a list of consenting consumers would necessarily be unlawful under the District Court's finding, axiomatically rendering the consent requirement mere surplusage.

The District Court also rejected Plaintiff's alternative argument that the SMS blaster's text to Plaintiff used an artificial voice. The Court found Plaintiff's argument was "simply beyond the bounds of common sense" and observed that the primary definition of voice in the dictionary was "sound produced by vertebrates by means of lungs, larynx, or syrinx; especially sound so produced by human beings." To the District Court, Plaintiff's reliance on a tertiary definition conflicted with the Court's belief of a "natural understanding" of the term. The District Court refused to consider Legislative History and regulations that supported Plaintiff's reading of the statute as supporting a finding that agentless communications constituted an artificial voice, despite acknowledging that this Court and the FCC held that a text is a call.[15] Instead, the District Court presented a strawman position involving a live sender of a text message that could respond to the message, which presents a false dilemma.

//.

///

---

[15] This implies that the words, whether spoken or written, in each communication should be treated similarly (as a voice).

## SUMMARY OF THE ARGUMENT

First, the District Court erred in granting Reward Zone's motion to dismiss under Rule 12(b)(6). Trim pled facts sufficient to support a reasonable inference that Reward Zone sent text messages to her cellular phone without express permission utilizing an ATDS. Trim alleged the text messages were sent by a dialing system that "has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." These allegations were plausible and well-supported with detailed facts that sharply differentiated Reward Zone's dialing software from that in *Facebook*. Such allegations included that an SMS blaster was used, that there was no human intervention in the transmission of the mass text blasts, and that mass text blasts were sent indiscriminately to consumers without prior express consent using spoofed numbers. Trim included actual dialer software Java code from similar systems that relied upon sequential number generators to both store and produce telephone numbers to be called by such dialers, as well as a detailed description of how the software was programmed to do so by using number generators to both store and produce telephone numbers to be called. These facts were sufficient to give rise to a reasonable inference that Reward Zone used an ATDS as defined by the TCPA. The District Court rewrote Plaintiff's allegations and narrowly interpreted them to say something less favorable, precluding Plaintiff from obtaining proving her allegations.

Second, after narrowly and unfavorably interpreting Trim's well-pled allegations, the District Court ignored the Supreme Court's stated test for determining whether a dialing system is an ATDS. "To qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163 (2021). Instead of applying this test, which is satisfied by Plaintiff's well-pled allegations, the District Court applied a new test found nowhere in the Supreme Court's order: "equipment is only an autodialer if it uses a number generator to generate the phone numbers themselves – not if the number generator is used merely to index the phone numbers or select phone numbers from that index." This ruling conflicts with *Facebook*, excising half of the disjunctive test ("store or produce") from the plain language of the statute. It is also impossible for a plaintiff to allege in good faith that an autodialer operates in such fashion, creating an impossible test that consumers could never satisfy.

Third, the District Court committed legal error by holding that an SMS message, which is a "call" under the TCPA, can never be placed using an "artificial voice." The District Court's Order that the term "voice" is unambiguous ignores the presence of dueling dictionary definitions of the term "voice" and gives preference to a definition that results in the word "artificial" being excised from the

statute. If "voice" is ambiguous, then the District Court should have looked to the legislative history and other canons of construction (including the remedial statute doctrine) as cited by Trim, which strongly support a reading where non-oral written telephonic communications made by a computer qualify for the same privacy protections as non-oral auditory noises made by a computer and communicating the same message.

## STANDARD OF REVIEW

A dismissal for failure to state a claim pursuant to Rule 12(b)(6) is reviewed *de novo. Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. See Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The scope of review is "generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of which [the Court of Appeals] may take judicial notice." *Zucco Partners, LLC v. Digimarc*

*Corp.*, 552 F.3d 981, 988 (9th Cir. 2009), as amended (Feb. 10, 2009). The appellate court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

"Factual allegations must be enough to raise a right to relief above the speculative level" *Id.* "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). "[A] well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely'" *Twombly*, 550 U.S. at p. 556, *quoting Scheuer*, 416 U.S. at p. 236. Moreover, where the facts supporting the plaintiff's allegations are peculiarly within the possession and control of the defendant—not reasonably ascertainable by the plaintiff—the plaintiff is permitted to plead such facts on information and belief. *See Carolina Cas. Ins. Co. v. Team Equipment, Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1224 (3d ed. 2004) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff ....").

///

///

## ARGUMENT

## I. Trim Alleged a Plausible Claim that Reward Zone Used an ATDS to Place Calls to her Cellular Telephone.

Trim's position is straightforward. A number generator is a specific piece of software coding that objectively can be reviewed and determined to either be or not be used in a dialing system. One need only review the programming code to ascertain whether such coding is present and being used. The Supreme Court stated that random or sequential number generators must be used in the dialer software, either to "store or produce telephone numbers to be called." Trim alleged that Reward Zone's system used number generators to <u>both</u> store <u>and</u> produce telephone numbers to be called. Trim provided detailed allegations about how an SMS blaster is typically programmed to do so, including illustrations of source code where such number generators are present in systems that function similarly to how Reward Zone's system functions. Trim provided additional allegations giving rise to a strong inference that number generators must have been used to send marketing text messages to her telephone. Yet, the District Court dismissed her claims and denied her the opportunity to discovery.[16]

---

[16] Such discovery would primarily consist of reviewing source code for the dialing platform, and having experts explain whether and how it implements a random or sequential number generator to store or produce telephone numbers to be called.

Trim stated plausible allegations that should have been treated as true for purposes of Defendant's motion. Trim's description of the dialing system fell squarely within the Supreme Court's definition of ATDS, yet the District Court made up its own new test that is substantially different in numerous ways from the Supreme Court's instructions. Trim only asks that the Ninth Circuit follow the Supreme Court's ruling in *Facebook*, as well as guidance from both this Court and the Supreme Court which instructs courts to view complaints in the light most favorable to a non-moving party, where there is even a slim chance of success on the merits.

### A. What Is A Random Or Sequential Number Generator?

Random or sequential number generators are common programming tools used by software engineers when designing software, to automate certain functions in ways that would otherwise be performed by human hand. This term was not invented by Congress. It does not mean the same thing as "telephone number generation."[17] Any software engineer will agree. Number generators are a widely

---

[17] The statutory text of 47 § 227(a)(1) states "The term "automatic telephone dialing system" means equipment which has the capacity— (A)to store or produce telephone numbers to be called, using a random or sequential number generator..." The use of the phrase "telephone numbers to be called" in the same code section as "number generator" and the key distinction between the term "telephone number" and "number" thereafter indicate that a number generator is not referring to a telephone number generator. Otherwise, the statute would have said "to store or

understood tool of software engineers.[18]

Imagine playing a game of video blackjack. Such programs rely upon number generators to randomize the cards received by the player and the dealer. A number generator does not generate the cards. Those are predetermined by the 52 cards in a standard deck. However, it might generate a number between 1-52 which determines which card the player receives out of the deck. Parsers (number generation code) might be used to index and store the cards of the deck in RAM and assign numbers to each card. A random number generator might then be used to generate a number between 1-52 which matches with the card that was assigned that corresponding number by the parser. The card will then be produced from storage and shown on the screen to the player. This allows the program to operate without a dealer shuffling the deck or dealing the cards through a program that automates this process without the labor cost associated therewith. It cannot be done without random or sequential number generators. An ATDS is basically a video blackjack machine on steroids, which instead of dealing cards, dials telephone numbers, and instead of doing it one hand/call at a time, deals a thousand hands or dials a thousand calls per second.

produce telephone numbers to be called, using a random or sequential [telephone] number generator."

[18] *See* https://en.wikipedia.org/wiki/Random_number_generation; https://en.wikipedia.org/wiki/Pseudorandom_number_generator; https://www.reformattext.com/sequential-number-generator.htm

Undersigned counsel studied the code used to program SMS blasters with the assistance of software engineers fluent in Java and found they execute number generation code to store and produce numbers to be called by the dialer. Trim alleged such number generators were used by Reward Zone's dialing software, and provided actual dialer code, and illustrations for how this might be done, like a video blackjack machine. Using parsers, Trim's number (and other consumers' numbers) might have been indexed and stored using a sequential number generator, just like the assignment of cards in a deck by the blackjack machine. Using other number generators, Trim's number would be produced from storage and called forth to the dialer program, which would then know that her number was the one to be called, much like the card being shown to the player on a blackjack machine's screen.

Such programs can dial thousands of consumers in mere seconds, without human intervention, based on whatever parameters are targeted by the operator of the dialing platform (campaigns).[19] Number generators (such as the Apache code in Trim's Complaint) are executed in the process of mass SMS blasting. The

---

[19] Blackjack machines are not typically programmed to operate with this level of speed, because it destroys the purpose of the enjoyment of the game for the player if the machine processed thousands of hands per second. But an SMS blaster's goal is speed, not enjoyment, and it is usually programmed to send messages to every telephone number in storage in rapid succession *en masse*.

program cannot function, and therefore cannot dial phone numbers at all, without executing number generators. SMS blasters rely on random or sequential number generators to instruct databases to store and produce telephone numbers to be called. Without this key component, a dialing campaign would require an agent to manually place calls, via organic decision making, or as in *Facebook*,[20] through some other organic one-to-one triggering event.

B. The District Court Misapplied *Facebook's* ATDS Test

*Facebook* does not hold that every TCPA alleging use of an ATDS should

---

[20] In *Facebook*, that organic event was somebody trying to gain access to a Facebook account without authorization, and Facebook's system being programmed to notify the account holder. The system did not use random or sequential number generation, but rather simply dialed numbers automatically from a stored list. This is different from the example of the blackjack machine in that a specific card would expressly be requested by the system, bypassing the need for number generators in storage or production. Consistent with the Supreme Court's ruling, just because a computer sent the message does not mean random or sequential number generation is involved. Computers can be programmed to complete isolated tasks upon the occurrence of an isolated organic triggering event. If there are a lot of triggering events, this could optically appear to the untrained eye to be mass dialing, but it is not. The key distinction is that the code in SMS blasters use number generation and dialing campaigns to decide which telephone numbers to dial, while the code in the *Facebook* platform apparently did not, and so it did not fit within the plain language definition of an ATDS. The platform used here sent out impersonal advertisements to thousands of consumers soliciting Reward Zone's services. Systems which "blasts" messages to many people necessarily use a random or sequential number generator.

be dismissed on the pleadings.[21]  Nor does *Facebook* hold that an autodialer must self-generate telephone numbers.  The sole question in *Facebook* concerned a syntax dispute over whether the phrase "using a random or sequential number generator" modified both "store" and "produce."  The Supreme Court held that it did, and that therefore, to be an ATDS, a dialing system must use some form of number generation in its programming code to either store or produce the telephone numbers to be called.  The Supreme Court did not hold that a dialer must generate random or sequential *telephone* numbers to meet the autodialer definition.  Such a holding would have required the Supreme Court to decide the meaning of the phrase "random or sequential number generator"—a question that was not at issue and was not briefed.  It also would have required the Supreme Court to significantly alter the plain language of the statute, including by excising words from the statute, and adding words beyond the definition.

In *Facebook*, the Supreme Court held "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity **either** to store a telephone number using a random or sequential generator **or** to produce a telephone number using a random or sequential number generator." 141 S.Ct. at

---

[21] This would be the practical result of upholding the District Court's Order because autodialers do not self-generate the telephone numbers they then dial. Such systems have not been used since the 1960s.

1163 (emphasis added). The Court further observed that "advances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts. Infamously, the development of "robocall" technology allowed companies to make calls using artificial voices, obviating the need for live human callers altogether." *Id.* at 1167.

The Court determined that the texting platform used by Facebook, which sent one-to-one text messages to individuals upon a triggering event and was not alleged to rely on random or sequential number generator coding for either storing or producing telephone numbers to be called, was not the type of technology targeted by Congress. It went on to observe that inclusion of technology that could merely store and then automatically dial, without employing number generation, presented real world problems of overbreadth because such systems "could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses." *Id.* at 1171.[22] The Court correctly referenced the possibility that "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a pre-

---

[22] A smartphone is <u>not</u> an ATDS under Appellant's reading of *Facebook*.

produced list.  It would then store those numbers to be dialed at a later time."[23] *Id.* at 1172 n.7.[24]  Such a random number generator would not generate telephone numbers; instead, it would generate what are called index numbers, which correspond to the positions of telephone numbers in an ordered list.[25]  This footnote shows, at the very least, that the Supreme Court did not commit to any specific definition of "random or sequential number generator."  In fact, it alludes to some aspects of the very technology Trim alleges was used to dial her.

Two interpretations of the autodialer definition were at issue in *Facebook*.  First was the interpretation favored by Facebook and adopted by the Third, Seventh, and Eleventh Circuits that required an autodialer to have the "capacity" to

---

[23] This part of the Court's reasoning in is inconsistent with any assumption that the "random or sequential number generator" must generate *telephone* numbers.  It is also worth noting that predictive dialers and SMS blasters operate in the exact manner described by the Supreme Court in footnote 7, and have for decades.  It is not only possible to store telephone numbers using a random number generator, but this is in fact something which many if not most autodialers are programmed to do.  An example of such number generation from an actual SMS blaster was pled in Trim's Complaint.

[24] Some courts have held that a system which automatically re-sequenced numbers on a campaign list would have qualified as an autodialer, if not for the fact that there was no evidentiary showing in the record by plaintiff that it did so by using a random or sequential number generator.  *See Grome v. USAA Savings Bank*, No. 4:19-CV-3080, 2021 WL 3883713, at *5 (D. Neb. Aug. 31, 2021).

[25] This excludes cellular telephones, as one's contact lists are stored, produced, and dialed without use of number generators.

"us[e] a random or sequential number generator" to either produce or store telephone numbers to be called. *Facebook*, 141 S. Ct. at 1169. Second was the interpretation favored by Duguid and adopted by the Second, Sixth, and Ninth Circuits, which found that it was sufficient that a dialer "store . . . telephone numbers to be called" and "dial such numbers." *Id..* The key difference in the two interpretations was a question purely of syntax: whether "using a random or sequential number generator" modified both "store" and "produce" or just "produce." *Id.*

The meaning of "random or sequential number generator" was not at issue. Duguid and the plaintiffs in the other circuit court cases argued that an autodialer need not use a number generator at all. The Supreme Court found that "the most natural construction" of the autodialer definition required that the phrase "using a random or sequential number generator" modify both "store" and "produce." *Facebook*, 141 S. Ct. at 1169. As a result, the Court declared that "whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator." *Id*. at 1170. Indeed, the Court repeatedly framed the question presented and its holding without reference to telephone number generation.[26] The Court's holding and primary analysis were based on the syntax

---

[26] The Court framed the question presented as having to do with telephone number generation only once. *Duguid*, 141 S. Ct. at 1168. In every other place where the Court stated the question presented or its holding, the Court did so without

of the clause, not the meaning of the phrase "random or sequential number generator." *Id.* at 1169–70. All other considerations merely "confirm[ed]" the syntactic analysis. *Id.* at 1171.

The District Court's ruling conflicts directly with the Supreme Court's test in numerous ways. As discussed below, the Supreme Court's test is consistent with the statutory text, with legislative history, and with historic existing FCC regulations, as well as doctrines established through precedent. The District Court's ruling conflicts with all of this and turns the TCPA on its head in multiple ways.

C. The District Court's Ruling Conflicts with the Plain Language of the Statute and Ignores Half of the Supreme Court's Test

"A statute should be construed so that effect is given to all its provisions, so

---

reference to telephone number generation. *Id.* at 1167 ("To qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator"); 1169 ("We conclude that the clause modifies both, specifying how the equipment must either "store" or "produce" telephone numbers. Because Facebook's notification system neither stores nor produces numbers "using a random or sequential number generator," it is not an autodialer."); 1171 ("the autodialer definition excludes equipment that does not 'us[e] a random or sequential number generator'"); 1173 ("This Court must interpret what Congress wrote, which is that 'using a random or sequential number generator' modifies both 'store' and 'produce.'"); 1173 ("We hold that a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called.")

that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 129 S.Ct. 1558, 1566 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). A "court should give effect, if possible, to every word and every provision Congress used" in the statute. *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013). A court should likewise "interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000); *see generally* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, pp. 174–183 (1st ed. 2012) (discussing the surplusage and harmonious-reading cannons). Upholding the District Court's ruling would require both ignoring the Supreme Court's test for ATDS, and drastically overhauling the plain language of the TCPA.

"The term "automatic telephone dialing system" means equipment which has the capacity— (A)to store or produce telephone numbers to be called, using a random or sequential number generator..." 47 § 227(a)(1). To qualify as an ATDS "a device must have the capacity **either** to store a telephone number using a random or sequential generator **or** to produce a telephone number using a random or sequential number generator.") (emphasis added). *Facebook* , 141 S. Ct. at 1163. Both the Supreme Court's test and plain language of the statute emphasize a disjunctive test for the use of number generators. Either a random or sequential

number generator can be used to "store" or it can be used to "produce." Trim alleged Reward Zone's system did both. And yet, the District Court held in dismissing her claims that the "equipment must use a number generator to generate the phone numbers themselves."

The canon against superfluity strongly undermines the District Court's holding, which categorically excluded "storage" as a component of the disjunctive test outlined by the statute, and reinforced by the Supreme Court. The statute says "to store or produce" not "to generate." The District Court, by categorically excluding dialing platforms that index and store telephone numbers to be called using number generators, carved out half the test for whether a system is an ATDS. The language "store or" becomes "inoperative, superfluous, void and insignificant" with such a ruling, as if it were excised completely from the statute. The District Court did not give effect to these words that Congress used, and which the Supreme Court took great effort to separately describe in its test, and even provided illustrations of how it might be employed in footnote 7. Accordingly, the District Court's test is unsupported by the plain language of the statute, as well as by the Supreme Court's test in *Facebook*.

Additionally, an interpretation that the definition of ATDS categorically precludes dialing from stored lists of telephone numbers would render the prior express consent requirement mere surplusage. A cornerstone of the TCPA is its

codified affirmative defense - prior express consent. *See* 47 U.S.C. §§ 227(b)(1)(A) ("It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States-- (A) to make any call (other than a call made for emergency purposes or <u>made with the prior express consent of the called party</u>) using any automatic telephone dialing system or an artificial or prerecorded voice"). (emphasis added). Prior express consent is an affirmative defense to any otherwise-violative conduct under the TCPA. *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017); I*n the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 565 (Jan. 4, 2008); ER-73 ("The use of automatic dialing machines which play recorded messages should be reasonably restricted, except where a called party has given prior consent to receive the recorded message.").

An autodialer that is required to self-generate its own lists of numbers to dial, as opposed to dialing from a stored list, could never be used in compliance with the TCPA because there is by definition a lack of consent from an individual whose number is randomly generated. These two concepts are mutually exclusive. It is not only fanciful to imagine, but axiomatically impossible, for there to exist <u>only</u> automated dialing technology that self-generates lists of numbers, in the same universe where stored lists of numbers belonging to consumers that have consented

to receive autodialer communications are being exclusively called. And yet, entire regulatory schemes exist to create standards for what is and is not prior express consent. Dozens of circuit cases talk about what it means to consent to a robocall. The plain language of the statute codifies an affirmative defense for users of autodialer technology so long as they call only those people that consent to receive such calls. Regulations have been adopted. Companies (including Reward Zone) spend resources obtaining consumer contact information to attempt to comply with the written consent requirements when placing calls using otherwise-prohibited technology.

Indeed, Reward Zone's own position regarding consent undermines its view of what constitutes an ATDS. One cannot "consent" to autodialing if by axiom autodialing cannot be performed to a limited list of those who have so consented. And so it follows that by requiring self-generation as a component of the statute, the District Court's definition of ATDS axiomatically excises an entire canon of codified doctrine right out of the plain language of the statute. These two concepts cannot be reconciled.

Reading a statute in a manner which renders core portions of the statute mere surplusage should be avoided when interpreting a statute. *See Duncan v. Walker*, 533 U.S. 167, 174, (2001) ("We are especially unwilling" to treat a statutory term as surplusage "when the term occupies so pivotal a place in the

statutory scheme"). The canon assists "where a competing interpretation gives effect to every clause and word of a statute." *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238, 2240 (2011). Consent is an inextricable component of the TCPA, as it is in any invasion of privacy statute, because it is not an invasion of privacy if it has been permitted. Guests are not intruders by virtue of their mere presence in one's homes. Yet the plain language of the TCPA can clearly be read two ways with respect to whether or not an ATDS must self-generate the numbers it autodials.

There exists a reading of the TCPA where autodialers do not self-generate lists, but there is no TCPA without the affirmative defense of consent, because consent cannot coexist with autodialers that cannot dial stored lists of numbers. The District Court's Order, if upheld, would require two sections of the TCPA (47 § 227(a)(1) and 47 U.S.C.A. §§ 227(b)(1)(A)) to be rewritten to say something materially different from what Congress enacted, and what the Supreme Court reinforced in *Facebook*. The District Court's Order is therefore in error and must be reversed.

> D. Legislative History and FCC Rulings Support Predictive Dialers Being an ATDS, and SMS Blasters are Programmed Using the Same Number Generator Functions

To illustrate this point further, the legislative history and early FCC rulings

on the TCPA support the conclusion that *Facebook* did not disturb the TCPA's application to predictive dialers, which by extension, applies to the SMS blaster alleged by Trim. Predictive dialers, like SMS blasters, dial databases of telephone numbers in an automated fashion using campaign features, which rely upon random or sequential number generators to both store and produce the telephone numbers to be called.[27] Similar to SMS blasters, "predictive" dialers also call from a stored list of phone numbers, but utilize algorithms to "predict" when an agent will receive a live answer. This is described in the 2003 FCC Order, as well as in Amicus briefing in *Facebook*. ER-33—64.

The discussion of "predictive dialers" in the FCC's 2003 decision is particularly instructive on the importance of automation as it relates to the TCPA. The FCC described predictive dialers as follows:

---

[27] A recent Third Circuit's ruling suggests that traditional predictive dialers, which operate and are programmed identically to the SMS blaster allegedly used in this case, would be an ATDS because they rely upon number generators store and produce telephone numbers to be called. *Panzarella v. Navient Solutions, Inc*., 37 F.4th 867 (3rd Cir. 2022) (dismissing plaintiff's claims on grounds that the dialer was being used in preview mode and was detached from the random or sequential number generators but suggesting that it would be an ATDS had it been used in automated predictive or power dialer mode). *Panzarella* suffers from the timing of the appeal happening during *Facebook*, and therefore not having dialer code in the evidentiary record. Its ruling regarding random or sequential number generation can best be described as uninformed dicta. The present case offers a better vehicle to clarify what a random or sequential number generator is, and how it must be integrated into the dialer's source code in order to qualify as an ATDS.

[A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. ... The principal feature of predictive dialing software is a timing function, not number storage or generation. Household Financial Services states that these machines are not conceptually different from dialing machines without the predictive computer program attached.

2003 FCC Order, 18 F.C.C. Rcd. At 14091 (footnotes omitted). Acknowledging

the statutory definition of an ATDS, the FCC explained:

The statutory definition contemplates autodialing equipment that *either stores or produces* numbers. ... It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed–the *capacity* to dial numbers without human intervention. ...

The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers. ... Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome. Therefore, to exclude from these restrictions equipment that use predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result.

*Id.* at 14091-32 (footnotes and paragraph numbering omitted). The FCC found predictive dialers met the definition of an ÁTDS even though the calls were made from a list. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7973 (2015) (In 2003, "[t]he Commission stated that, even when dialing a fixed set of numbers, equipment may nevertheless meet the autodialer definition"). Predictive dialers are an ATDS.[28]

The terms "predictive dialer," "SMS blaster" and "campaign" never appear in the Supreme Court's ruling in *Facebook*, nor does the order ever suggest that campaign-based dialers are not an ATDS.[29] It is also worth mentioning that Facebook was not using an SMS blaster, but a completely different type of system that sent responsive text messages based on an organic triggering event. The Supreme Court did not say that SMS blasters are not an ATDS. They were not

---

[28] Even the FCC's first ruling on the TCPA in 1992 recognized the importance of restrictions on equipment such as predictive dialers. Referring in part to "predictive dialers" to place live solicitation calls (7 F.C.C. Rcd. 8752, 8756 (F.C.C. September 17, 1992)), the FCC then opined that "both live [referring again to live solicitation calls, such as with a predictive dialer] and artificial or prerecorded voice telephone solicitations should be subject to significant restrictions" (*Id.*).

[29] The Supreme Court had every opportunity to discuss predictive dialers in *Facebook*, because undersigned counsel put the issue before the Court in the briefing for the *Facebook* decision. ER-33—64. Why would nine Justices ignore this issue entirely? Because campaign-based dialers were not before the Court, and there was no contention that Facebook's system relied on campaign dialing or number generation.

presented with that question. They were not presented with that fact pattern, or the system specifications or the code for such a system. Indeed, the ruling suggests that reading the Supreme Court's order as precluding an ATDS finding as to such technology would "greatly overstate[] the effects of accepting Facebook's interpretation." *Facebook*, 141 S. Ct. at 1173. This is consistent with the history of autodialers, which have been dialing stored lists of numbers since the 1970s.[30] Predictive dialers, which dial stored lists of numbers using algorithms, have been prohibited since the passage of the TCPA, and have historically been prohibited by the FCC ever since.[31] And if predictive dialers are an ATDS, an SMS blaster would be as well because they function the same, both dial databases using campaigns, and both rely on the same number generator code to do so. Accordingly, the District Court's interpretation of a random or sequential number generator and finding that a system must self-generate telephone numbers is in

---

[30] *See* extensive discussion of predictive dialer patents at ER-33—64.

[31] *See* Hearing Before the Subcommittee on Communications of the Committee on Commerce, Science and Transportation, United States Senate One Hundred Second Congress First Session July 24, 1991, Testimony of Robert Bulmash and Steve Hamm at pgs 11, 16, 19, 24-25, and 27; 7 FCC Rcd. 8752, 8756 (F.C.C. September 17, 1992) at ¶¶ 8-9; *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Report and Order, 18 FCC Rcd. 14014, 14115 ¶¶ 131-134 (2003) at ¶¶ 8 fn 31, 131, and 146; see also 47 C.F.R. §§ 64.1200(a)(5-7) (prohibiting predictive dialing with certain abandonment rates, i.e. technology which automatically dials stored lists through campaigns).

conflict with the legislative and regulatory history of the TCPA.

### E. Courts After Facebook Have Agreed that Dialers do not Need to Self-Generate Telephone Numbers to be an ATDS

The District Court cited to one fellow court which agreed that an ATDS must self-generate telephone numbers. However, many courts do not agree with this interpretation of *Facebook*. Many courts have held that allegations relating to SMS blasters and traditional predictive dialing systems (which use number generators in the same manner as SMS blasters) are sufficient to survive the pleadings. One court found that SMS blast telemarketing messages from a long code telephone numbers sufficiently stated a claim where it was alleged that the platform could "store telephone numbers, generate sequential numbers, dial numbers in a sequential order, and dial numbers without human intervention." *Montanez v. Future Vision Brain Bank, LLC*, 536 F.Supp.3d 828, 838 (D. Co. April 29, 2021).

Dozens of courts have ruled similarly. *Atkinson v. Pro Custom Solar LCC*, 2021 WL 2669558 (W.D. TX June 16, 2021) (ATDS allegations survive pleadings where plaintiff alleges a use of a random or sequential number generator to determine dial sequence);[32] *Republican Senatorial Committee*, 551 F.Supp.3d 724

---

[32] This is exactly what Trim alleged, but in much greater detail, and with actual examples and illustrations of number generators in actual dialer code.

(W.D. TX July 27, 2021) (generic mass texts sufficient to plead ATDS); *Poonja v. Kelly Services, Inc*., 2021 WL 4459526 (E.D. IL, Sept. 29, 2021) ("stop" instruction in generic text sufficient to survive pleadings);[33] *Garner v. Allstate Insurance Company*, 2021 WL 3857786 (N.D. IL Aug. 30, 2021) (allegation of predictive dialer which spoofed telephone number consistent with ATDS);[34] *Callier v. GreenSky, Inc*., 2021 WL 2688622 (W.D. TX May 20, 2021) (same); *Jance v. Homerun Offer LLC*, 2021 WL 3270318 (D. AZ July 30, 2021) (same); *MacDonald v. Brian Gubernick PLLC*, 2021 WL 5203107 (D. Az. Nov. 9, 2021) (automatically dialing through imported lists of leads sequentially with a power dialer sufficiently states claim); *McEwen v. National Rifle Association of America*, 2021 WL 5999274 (D. ME Dec. 20, 2021) (rejecting the notion that an ATDS must self-generate telephone numbers).

Other decisions support Plaintiff's reading of a random or sequential number generator referring to programming code, and not to a telephone number generator. In *Barnett v. Bank of America*, 2021 WL 2187950 (W.D.N.C. May 28, 2021), the court agreed that an ATDS did not need to self-generate telephone numbers. However, it observed that plaintiff had not presented evidence that the source code relied on number generation. *Timms v. USAA Federal Savings Bank*, 543

---

[33] Trim's text messages shown above contain a stop message

[34] Trim alleged spoofing.

F.Supp.3d 294 (D. SC June 9, 2021) extensively discussed *Facebook* and its discussion in footnote 7 and held that an ATDS need not self-generate telephone numbers, but instead may rely on number generators to store telephone numbers to be called later. *Id*. at 299-302.

Trim acknowledges that there are cases on both sides of this debate, but the cases cited herein are more consistent with *Facebook* and the plain language of the TCPA. Holding that self-generation of telephone numbers is the standard would go beyond any reasonable reading of what Congress intended to prohibit. The courts cited herein got this right.

F. <u>The District Court Erred Procedurally by Failing to Accept Plaintiff's Allegations as True</u>

As described above, pursuant to authority from this Court and the Supreme Court, the procedural standards under Rule 12(b)(6) require courts to accept well pled allegations as true and read them with all inferences drawn in favor of plaintiff. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Well-pled allegations must be upheld on the pleadings to seek evidence in support thereof, even if there is only a remote chance of success. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Twombly*, 550 U.S. at p. 556.

Trim's Third Amended Complaint alleges facts which, when viewed, in the

light most favorable to Trim, plausibly suggest that Reward Zone contacted her on her cellular telephone through the use of an ATDS. Trim alleges she received SMS blast messages, sent using a system that operated similarly to a traditional predictive dialer, via spoofed numbers, involving generic spam messages sent without her consent and without any relation to the company, and that there was no human intervention involved in their transmission. Trim also asserted that random or sequential number generators were used both to store her telephone number through indexing, and then to produce her telephone number via indexed storage to the dialer, to be called. Trim provided actual dialer code from a dialing system similar to the one Reward Zone used, which relied upon a sequential number generator to do so, giving further credence to the legitimacy of her allegations.

Conclusions regarding Trim's TCPA claims are more appropriately drawn at summary judgment, after discovery regarding the specifications of the dialer and expert review. This court held similarly where less detail was pled regarding use of an ATDS in *Flores v. Adir International, LLC*, 685 Fed.Appx. 533 (9th Cir. March 24, 2017). The same result should have occurred here. This is even more true where possession of the dialer code is solely within possession of the defendant, precluding Trim any access to the very information she would otherwise need to state a valid claim. *Carolina Cas. Ins. Co. v. Team Equipment, Inc.*, 741 F.3d 1082,c1087 (9th Cir. 2014). The District Court therefore erred in

granting the motion to dismiss.

Many courts post-*Facebook* elected to follow this approach rather than issue preemptive rulings denying plaintiffs their right to discovery. *Miles v. Medicredit, Inc.*, No. 4:20-CV-01186 JAR, 2021 WL 2949565, at *4 (E.D. Mo. July 14, 2021); *Bell v. Portfolio Recovery Assocs., LLC*, No. 5:18-CV-00243-OLG, 2021 WL 1435264, at *1, fns. 4-5 (W.D. Tex. Apr. 13, 2021); *Montanez v. Future Vision Brain Bank, LLC*, No. 20-CV-02959-CMA-MEH, 2021 WL 1697928, at *7 (D. Colo. Apr. 29, 2021); *Gross v. GG Homes, Inc.*, No. 3:21-CV-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021) ("Plaintiff need not include additional details concerning the process by which Defendant's device stores and produces phone numbers. Plaintiff need not describe the technical details of Defendant's alleged ATDS at this stage. The issue is appropriately addressed following discovery and on a motion for summary judgment."); *Atkinson v. Pro Custom Solar LCC*, No. SA-21-CV-178-OLG, 2021 WL 2669558, at *1 (W.D. Tex. June 16, 2021) ("As a practical matter, no plaintiff will have personal knowledge of the defendant's telephone system at the pleadings stage."); *Jance v. Home Run Offer LLC*, No. CV-20-00482-TUC-JGZ, 2021 WL 3270318, at *3 (D. Ariz. July 30, 2021) ("whether a defendant has an ATDS is often a fact exclusively within the defendant's possession…"); *Garner v. Allstate Ins. Co.*, No. 20-C-4693, 2021 WL 3857786 at *4 (N.D. Ill. Aug. 30, 2021) (same) (citing *Vance v. Bureau*

*of Collection Recovery LLC*, No. 10 C 6324, 2011 WL 881550, at *2 (N.D. Ill. Mar. 11, 2011)).

Trim plausibly alleges that Reward Zone utilized an ATDS or, stated differently, "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." Without the benefit of discovery, Trim lacks the ability to specifically identify the code in Reward Zone's system, however, under the pleading standards of the TCPA, Plaintiff has alleged sufficient facts to plausibly suggest that the system qualifies as an ATDS. For these reasons, Trim's Complaint should not be dismissed, and Trim should be given the opportunity to discover the exact specifications of Reward Zone's dialing system.

## II. Trim's Complaint Alleges Use of an Artificial Voice

Reward Zone's SMS blasts are artificial voices, in addition to having been sent via an ATDS. This is based on a plain language interpretation, as well as the statutory history, and cannons of construction regarding remedial statutes like the TCPA. The District Court erred in finding otherwise. Unlike the ATDS issue, which concerns questions of law, fact, and procedure, this is a pure question of law.

The starting point of statutory interpretation lies in the plain language. Trim bases her allegations on definitions from the dictionary of "artificial" and "voice."

Those definitions are as follows: Artificial - "humanly contrived often on a natural model: man-made <an [artificial] limb> <[artificial] diamonds>." Another definition is "lacking in natural or spontaneous quality." *Webster's Ninth New Collegiate Dictionary*, 106 (1991).

The District Court seemed persuaded that Reward Zones' text messages were artificial. Like a traditional artificial voice phone call, Reward Zone's messages were not organic. An organic text message would involve a live person sending it. Organic text messages are interactive – one can respond to them and receive a natural response back from a person, not a machine. Reward Zone's message was drafted in advance and stored in a computer and blasted out to the masses at a later preprogrammed time. It lacked spontaneous quality. Its transmission was incapable of natural alteration, or natural response. The timing of when and how it was to be sent were determined by a computer, not a person. A robot sent the message. Clearly, it is artificial.

Reward Zone only challenged, and the District Court only took issue with the question of whether the transmission of an artificial text message constitutes a "voice." It is true that there are definitions of "voice" which hinge on oral utterances, vocal cords, and the like, such as the definition cited by the District Court in its order dismissing the claims. However, there are dictionary definitions that extend voice to other forms of communication. An illustrative

question frames this issue: do mute persons not have a voice under its common parlance? Can they not voice opinions, or concerns? Can they speak or express themselves using other tools as their voice? They clearly can and do. That is why, in part, there are multiple definitions of the word voice.

The sole legal question that must be answered by this Court is whether Trim's interpretation of "voice," which is supported by some definitions in the dictionary, and by common usage, is so strained that "voice" is entirely unambiguous. This would foreclose review of the weight of authority (discussed below), which overwhelmingly supports Trim's reasoning. If this question of ambiguity is overcome, Trim has stated a valid theory of liability.

## A. Voice is an Ambiguous Term

The District Court's reasoning is strained in multiple ways. The Court found that it was inconceivable that Congress had intended to extend oral voice calls to written communications in text messages. According to the District Court, the only definition of "voice" that Congress could have intended would have been "sound produced by means of lungs, larynx, or syrinx, especially sound so produced by human beings."

The problem with this reading is multifaceted. First, a statutory definition of voice which requires use of lungs, larynx or syrinx would axiomatically preclude artificial voices. Artificial voices do not "require use of lungs, larynx or syrinx"

and are not produced by any organic being. They are not oral utterances at all. They are noises created by computers. There is very little factual distinction between a computer which reads text communication and translates that communication into an artificial audible noise over a telephone and a computer which bypasses this step and simply sends the same text communication directly to a person's cellular telephone. Either way, there can be no doubt that under the District Court's application of its definition of "voice" there is no such thing as an "artificial voice." And so, that cannot be the correct definition, because such a definition excises words from the statute.

Second, the Court's focus on audible oral utterances implicitly conflicts with existing binding FCC Rules, recognized by this Court in, which recognize that a text message is a call under the TCPA. In *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946 (9th Cir. 2009), the Ninth Circuit held that a text message is a "call" within § 227(b)(1)(A), applying *Chevron* deference and deferring to the FCC's interpretation of the term. *Id*. at 953-54. Even *Facebook* concerned a text message which was considered a call. As discussed *supra*, statutes must be read in harmony.

The TCPA prohibits "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 47(b)(1)(A). If a text message is a call, then the disjunctive test (either an

ATDS, <u>or</u> an artificial or prerecorded voice) would have to be modified to exclude the second disjunctive element of the test entirely, because there would not be such a thing as an artificial voice for calls that are text messages. Stated otherwise, in the case of a traditional call, the TCPA prohibits "using any automatic telephone dialing system or an artificial or prerecorded voice," but in the case of a text message, the TCPA only prohibits "using any automatic telephone dialing system." As discussed above, a statute must give meaning to all words written therein by Congress, and not result in surplusage.

Thus, the District Court's interpretation of the statute is inharmonious. Such a reading excises the term "artificial" from the statute, as well as leading to surplusage in the context of artificial calls when those calls are placed via SMS messages. Accordingly, the term voice should be treated as ambiguous.

### B. Voice Should Be Interpreted Broadly

There are several reasons to believe the definition of voice targeted by Congress should be interpreted broadly. The purpose of the TCPA is to protect consumer privacy from intrusive telephone communications. The legislative history[35] is clear that the original focus on artificial voice technology prohibition

---

[35] Where a statute is ambiguous it is appropriate to look to legislative history. *Nakano v. United States*, 742 F.3d 1208, 1214 (9th Cir. 2014).

was the fact that such communications involved agentless calls.[36]

> "NACAA officials concluded that complaints about machine-generated telephone calls is one of the fastest growing categories of complaints. The public at least deserves the right to slam the telephone receiver down and have a real person on the other end of the line bear just how frustrated and angry those calls make people and should also have the ability to limit these intrusive calls."

ER-72.

Mr. Hamm went on to distinguish agentless (artificial/prerecorded calls) from those which were live operator assisted (ADADs).[37] *Id*. at 11-12. Indeed, the legislative history numerously emphasizes that the artificial/prerecorded voice prohibitions hinge on the fact that the calls are agentless, i.e. the lack of having a conversation with someone on the other side who can respond to questions or frustration, and instead receiving a static, one-sided message.[38] Congress was

---

[36] Trim believes that the crux of an artificial voice being prohibited by Congress stems from a desire to prohibit agentless telephone communications.

[37] For purposes of this analysis, ADAD is historically equivalent to ATDS.

[38] ER-71. ("[O]ne of the constant refrains that I hear . . . from consumers and business leaders who have gotten these kinds of computerized calls is they wish they had the ability to slam the telephone down on a live human being so that that organization would actually understand how angry and frustrated these kinds of calls make citizens, and slamming a phone down on a computer just does not have the same sense of release."); 137 Cong. Rec. S18785-01, S18786 (Nov. 27, 1991) ("Autodialers have grown in use because, as a New York Times story put it, 'they don't eat, they don't sleep and their feelings never get hurt when people curse them or hang up on them. They just call and call and call-each one up to 1,500 times a

being presented with two distinct privacy threats – automated calls sent in high volumes with a computer involving a live agent (campaign/predictive dialers), and agentless calls where consumers were deprived of the dignity of expressing their frustration because only a computer lay at the other end of the telephone (artificial/prerecorded voice).[39]   The goal of the statute is served by interpreting "voice" under a broad definitions offered by the dictionary.

---

day.'"); 137 Cong. Rec. H11307-01, H11312 (Nov. 26, 1991) ("[R]obotic calls by machines such as autodialers and computer-generated voices to be a much greater threat to the privacy of our homes than calls by live operators. At least you can vent your anger to a real person if they have interrupted your dinner. You can ask them questions and hold them accountable to some extent.").

[39] The FCC agreed with this distinction.  In 1992, the FCC's first ruling on the TCPA recognized the importance of restrictions on equipment two separate types of equipment: "live," which were generally understood to be predictive dialer calls, and "artificial or prerecorded voice" which were characteristically agentless.  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 8756-57 (F.C.C. September 17, 1992).  Similarly, the Sixth Circuit held, "Congress drew an explicit distinction between 'automated telephone calls that deliver an artificial or prerecorded voice message' on the one hand and 'calls placed by 'live' persons' on the other." *Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737, 743 (6th Cir. 2013).  Additionally, the FTC has observed that artificial and prerecorded voice calls are by their very nature one-sided conversations, and if there is no opportunity for consumers to ask questions, offers may not be sufficiently clear for consumers to make informed choices before pressing a button or saying yes to make a purchase. 73 FR 51164-01, 51167 (Aug. 29, 2008).  Reward Zone's SMS blasting platform accomplishes an identical goal of transmitting agentless one-sided messages.

The TCPA is a remedial statute intended to protect consumers from unwanted automated telephone calls and messages, it should be construed in accordance with that purpose. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1047 (9th Cir. 2017) (citing *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013)). Because the TCPA is a remedial statute, it "should be construed broadly to effectuate its purposes." *Caplan v. Budget Van Lines, Inc.*, No. 220CV130JCMVCF, 2020 WL 4430966, at *3 (D. Nev. July 31, 2020). Any ambiguities in the statutory text must be construed in the consumers' favor, under well-understood canons of construction. *Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 58 (2d Cir. 2017). A remedial statute "is entitled to a broad interpretation so that its public purposes may be fully effectuated." *Marriott v. National Mut. Cas. Co.*, 195 F.2d 462, 466 (10th Cir. 1952).

The dueling dictionary definitions as to the term "voice" are such an ambiguity. Construing the ambiguity in Plaintiff's favor serves the policy underlying the prohibition on artificial communications. This is similar to analysis in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009), where this Court found a "call" under the TCPA includes text messages because such definition "is consistent with the dictionary's definition of call in that it is defined as 'to communicate with or try to get into communication with a person by telephone' " and because it "is also consistent with the purpose of the TCPA—to

protect the privacy interests of telephone subscribers."

Thus, voice should apply to any telephonic communication covered by the statute pursuant to 47 U.S.C. § 227(b)(1)(A). Clearly, the emphasis of the statute was on prohibiting one-sided conversations.[40] SMS blasts are just that. Trim could only slam the phone down on a robot, just like the consumers that Mr. Hamm pled with Congress to protect from such indignity when they enacted the TCPA. The dictionary supports this as a possible interpretation, and the legislative history contemplates any agentless communication being an artificial voice. Accordingly, canons of construction strongly support Plaintiff's reading of the statute.

## CONCLUSION

For the foregoing reasons, the District Court erred in granting Reward Zone's motion to dismiss Trim's claims under 47 U.S.C. § 227(b)(1). Trim respectfully requests that this Court reverse the District Court ruling and order the

---

[40] The District Court voiced concerns about overbreadth; however, its examples do not relate to agentless messages and are inapplicable red herrings. In those messages, an agent manually sent the messages and was able to thereafter receive and respond to potential responses. The example also did not relate to telemarketing. There would be prior express consent where an acquaintance was sending messages to friends who provided their phone numbers. The risks of friends suing each other for inviting one another to dinner parties cited by the District Court are simply not realistic concerns.

District Court to reinstate Trim's 47 U.S.C. § 227(b)(1) claims against Reward Zone.

Dated: September 19, 2022                           Respectfully Submitted,


                                    BY: /s/ Todd M. Friedman
                                        TODD M. FRIEDMAN
                                        ADRIAN R. BACON
                                        THOMAS E. WHEELER


                                        ATTORNEYS FOR
                                        APPELLANT

## STATEMENT OF RELATED CASES

Appellant is unaware of any related cases currently pending before this Court.

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. 32(a)(7)(c) AND CIRCUIT RULE 32-1

I certify pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1 that the attached Opening Brief for the Appellant Lucine Trim complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) and (6) as it is proportionately spaced, has a typeface of 14 points, and contains 13,734 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: September 19, 2022                                 Respectfully Submitted,


                                        BY: /s/ Todd M. Friedman
                                            TODD M. FRIEDMAN

                                            ATTORNEYS FOR
                                            APPELLANT

# CERTIFICATE OF SERVICE

I, Todd M. Friedman, certify that on September 27th, 2022, the Appellant's Opening Brief was e-filed through the CM/ECF System, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities. The Court's CM/ECF system sends an email notification of the filing to the parties and counsel of record listed above who are registered with the Court's EMC/ECF system. A copy of the e-filed documents were sent, via the EMC/ECF system:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
JAY T. RAMSEY,
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055

KLEIN MOYNIHAN TURCO LLP
Neil E. Asnen (*pro hac vice*)
450 Seventh Avenue, 40th Floor
New York, New York 10123

### LAW OFFICES OF TODD M. FRIEDMAN

BY:  /s/ Todd M. Friedman
Todd M. Friedman, Esq. (SBN 21675)
21031 Ventura Blvd., Ste. 340
Woodland Hills, CA 91364
Phone: (877) 206-4741
Fax: (866) 633-0228
Email: tfriedman@toddflaw.com