IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

## Circuit Court Case No. 22-55517

LUCINE TRIM, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

PLAINTIFF-APPELLANT,

v.

REWARD ZONE USA LLC, *ET. AL.*

DEFENDANT-APPELLEE.

## PLAINTIFF-APPELLANT LUCINE TRIM'S REPLY BRIEF

APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT CASE NO.: 2:20-CV-01027-SVW-KS
(HONORABLE STEPHEN V. WILSON)

**LAW OFFICES OF TODD M. FRIEDMAN**
Todd M. Friedman, Esq. (SBN 21675)
Adrian R. Bacon Esq. (SBN 280332)
Thomas E. Wheeler (SBN 308789)
21031 Ventura Blvd, Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
Email: tfriedman@toddflaw.com

*ATTORNEYS FOR APPELLANT*

**TABLE OF CONTENTS**

INTRODUCTION.........................................................................1

LEGAL ANALYSIS ...................................................................6

  I. THIS PANEL IS BOUND BY *BORDEN*, BUT ITS ORDER SHOULD
NOT EMBRACE BORDEN'S FLAWS ........................................6

  II. AN ARTIFICIAL VOICE SHOULD BE INTERPRETED TO
ENCOMPASS AGENTLESS SMS MESSAGES ...........................8

CONCLUSION........................................................................17

CERTIFICATE OF COMPLIANCE PURSUANT TO....................19

CERTIFICATE OF SERVICE ..................................................20

# TABLE OF AUTHORITIES

**Cases**

*Animal Legal Defense Fund v. United States Department of Agriculture*, 933 F.3d 1088 (9th Cir. 2019).............................................................................10

*Barr v. American Association of Political Consultants, Inc*., 140 S.Ct. 2335 (2020) ...................................................................................................................15

*Borden v. eFinancial, LLC*, 53 F.4th 1230 (9th Cir. 2022) ........................................1

*Brickman v. United States* 56 F.4th 688 (9th Cir. 2022) ............................................1

*Cal. All. of Child & Family Servs. v. Allenby*, 589 F.3d 1017 (9th Cir. 2009) .......10

*Corley v. United States*, 129 S.Ct. 1558 (2009).......................................................10

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ....................................................1

*FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120 (2000).......................11

*Hibbs v. Winn*, 542 U.S. 88 (2004) ...........................................................................10

*Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) .................. 12, 14

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)................................................................10

*United States v. Pacheco*, 977 F.3d 764 (9th Cir. 2020) .........................................10

## INTRODUCTION

As explained in detail by Trim in her Petition for *En Banc* Review (Dkt. No. 28), *Borden v. eFinancial, LLC*, 53 F.4th 1230 (9th Cir. 2022) ("*Borden*") was wrongly decided, as it is in conflict with the Supreme Court's decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ("*Facebook*"), as well as being called into question just weeks after the decision in a strongly worded and compelling concurrence in *Brickman v. United States* 56 F.4th 688, 692 (9th Cir. 2022) ("*Brickman*").

Trim's allegations bring to light the absurdity of the *Borden* decision. *Borden* mangles the plain language of the statute. This can be illustrated quite simply by the fact that Trim alleges that Reward Zone's SMS Blaster relied upon and used a sequential number generator to store and produce telephone numbers to be called. The plain language of the statute and the Supreme Court's interpretation of that language proffer an even less stringent factual threshold as a test. "To qualify as an 'automatic telephone dialing system,' a device must have the capacity **either** to store a telephone number using a random or sequential generator **or** to produce a telephone number using a random or sequential number generator." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) (emphasis added).

Trim has receipts for these allegations. Trim included actual dialer code into her complaint from an SMS blaster which functions identically to the one used by

Reward Zone. That code shows that the system uses a sequential number generator to store and produce telephone numbers to be called. That system employs such programing code which was used to automatically send thousands if not millions of unsolicited computerized artificial and agentless messages to the telephones of consumers who had no business relationship with Reward Zone and never consented to receive such annoying communications.

Channeling Jerry Maguire, the Supreme Court decreed: "show me the random or sequential number generator!" Trim did so. Yet following *Borden* would erroneously require Trim's claims be dismissed. That is because the *Borden* panel rewrote the statute to require an ATDS use a "random or sequential <u>telephone</u> number generator" which is not even something that exists, is not what the statute says, is not what the Supreme Court said the statute says, and which ignores the fact that a random or sequential number generator is actually a well-defined programming tool used by software engineers, while a "random or sequential <u>telephone</u> number generator" is a fictitious concept that the *Borden* panel created out of thin air. Judge Van Dyke in *Brickman's* concurrence said that *Borden* "mangles" the statute. That would be putting it mildly. Clearly, there was a massive misunderstanding about how ATDS technology works, and what a random or sequential number generator is when *Borden* was drafted. Trim's

appeal, with her detailed technological approach to a technological question, brings all of this to light and reveals the error.

This Panel is unfortunately stuck with *Borden*, as the *Brickman* panel held. But *Borden* was manifestly in error, for the reasons stated by Judge Van Dyke in his concurrence, as well as the reasons argued by Trim in her Petition for *En Banc* review and in the amicus filings. Trim admits that following *Borden* will result in her ATDS claims being dismissed, but *Borden* was wrongly decided, and it was so wrongly decided that at the very least, the Panel should include strong language in its Order questioning the analysis and the result, which would support Trim's request to seek review *en banc* or from the Supreme Court. Trim understands the unfortunate limitations of a subsequent panel being stuck with an erroneous decision of a prior panel and merely asks for the Court to conduct an independent analysis of the issue as part of its Order on her ATDS claims. Ideally, this appeal should go straight to an *en banc* panel, but Trim's Petition has yet to be ruled upon.

As to Trim's claims regarding Reward Zone's use of an artificial voice, her position stands largely unrebutted by statutory construction analysis, with Reward Zone simply citing to the fact that there is no case law on this issue beyond district court opinions that suffer from the same problems as the District Court's Order. Reward Zone's analysis repeats the errors of the District Court's Order and offers no solution based in statutory construction principles.

REPLY BRIEF      DOCKET NO. 22-55517

There is a glaring problem with Reward Zone's and the District Court's application of the term "artificial voice" to the facts as alleged by Trim – what definition of "voice" should be adopted by this Court in determining whether a call is an artificial voice within the meaning of the TCPA? The decisions cited by Reward Zone, and Reward Zone's own Brief, say that the answer is obvious, and a plain use of the phrase should be adopted. Great. If that is the case, then what is an artificial voice? And what is the legal analysis under statutory construction principles upon which such definition is based? The answer becomes much more complicated upon recognizing that there is no such thing as an artificial voice under the definition adopted by the District Court. The District Court's definition of an artificial voice requiring human lungs, a larynx and syrinx was in error because artificial voices do not have those things. This Court <u>must</u> do more than affirm. This Court <u>must</u> redefine the term "voice."[1]

---

[1] Dictionary.com has seventeen definitions of "voice" as a noun. Only five categorically require sound. Some notable definitions which do not, include:
"something likened to speech as conveying impressions to the mind"
"expression in spoken or written words, or by other means"
"an expressed opinion or choice"
"the person or other agency through which something is expressed or revealed"
*See* https://www.dictionary.com/browse/voice
Why are these definitions inferior to one involving lungs, larynx and syrinx? Such definitions have greater application to an artificial voice than that which was adopted by the District Court, which could never apply to an artificial voice by definition. Any of these definitions would be consistent with the plain meaning and the purpose of the TCPA, as would the definition in Trim's complaint.

Statutory interpretation requires an analysis of the plain language, the normal definitions of terms in their common parlance and dictionaries of the times, and, if no clear definition is apparent, a review of other portions of the statutory text, the purpose of the statute, the legislative history, and policy arguments, such as considering the remedial nature of the statute. Once ambiguity is introduced, which it must because even Reward Zone fails to offer an acceptable alternative definition, then Trim's arguments and authorities cannot be given short shrift.

The only definitions that makes sense in the totality of the plain language, the statutory purpose, the legislative history, and surrounding regulations regarding application of calls to text messages, which is supported by the plain language of the statute, the purpose of the TCPA, and the regulations that have been adopted over the decades of evolution of cellular telephone technology and texting since the TCPA's inception, are those where artificial voice prohibitions regulate all agentless (i.e. artificial) telephone communications which fall within the definition of a "call." The emphasis in the statute after all was quite plainly on prohibiting unmanned computers from clogging up peoples' telephones, not so much on whether a human being was speaking into said telephone.

Lines will have to be drawn by this appeal, which is unlikely to be the end of the battle between privacy advocates and telemarketers over what constitutes an ATDS and what constitutes an artificial voice. The *Brickman* panel made a bold

move in flagging its disagreement with *Borden*, and a concurring judge issued a rare scathing opinion explaining why that decision was so very wrongly decided. This Court should do the same, to give guidance to other reviewing courts as cases like this make their way inevitably back up to the Supreme Court. There is no such thing as a random or sequential <u>telephone</u> number generator. There is no such thing as an artificial voice which utilizes a larynx syrinx and lungs. So how can that possibly be the law?

## LEGAL ANALYSIS

## I. THIS PANEL IS BOUND BY *BORDEN*, BUT ITS ORDER SHOULD NOT EMBRACE BORDEN'S FLAWS

Trim acknowledges that while the "law of the circuit" doctrine was not always so ironclad, it is currently the practice of courts in this Circuit that a subsequent panel must follow even a clearly erroneous decision unless or until it is overturned by an *en banc* panel or by the Supreme Court. *Borden* was clearly erroneous, and results in manifest injustice to consumer privacy, for all the reasons set forth in Trim's opening Brief, her Petition for Initial *En Banc* Review, and the Amicus Briefs of EPIC and Public Citizen. However, rather than spend pages upon pages arguing these points, Trim simply asks this Court to review those arguments and come to its own independent conclusions about *Borden*.

Trim was decided on a motion to dismiss. Trim included dialer code in her complaint showing that Reward Zone's system relied upon a sequential number generator to store and produce telephone numbers as part of *en masse* agentless dialing campaigns.[2] And the statute does not prohibit use of a "random or sequential <u>telephone</u> number generator." The addition of the word "telephone" into the plain language of the statute suffers from the same criticism upon which the Supreme Court based its decision in *Facebook* to overturn *Marks*, due to this Court adding language to the statute about storing numbers and dialing "automatically" being the standard for an ATDS. The pendulum has swung back the other direction and swung too far. It will eventually reach equilibrium. This Panel should put its stamp on that eventual analysis by acknowledging that the straightforward technological approach of looking at how a dialer is programmed as proposed by Trim resolves the issue in a common-sense manner that presents no flaws under statutory construction. Perhaps then the "confusion sandwich" can be put to rest with much less litigation. Until then, consumers who are dialed without consent by systems using a random or sequential number generator that stores or produces their telephone numbers to be called by the dialer will continue to be

---

[2] It is a true shame that the *Borden* panel did not have such dialer code before them. They likely would have ruled much differently if confronted with an actual sequential number generator in the software code. The adage "bad facts make bad law" comes to mind.

harassed with no legal recourse, even though Congress said doing so was an invasion of their privacy rights.

## II. AN ARTIFICIAL VOICE SHOULD BE INTERPRETED TO ENCOMPASS AGENTLESS SMS MESSAGES

Any definition of "voice" adopted by this Court must permit for the existence of an artificial voice, elsewise it will excise the concept of an artificial voice from the plain language of the statute and the disjunctive test for prerecorded or artificial voices from the regulatory prohibitions. The District Court's definition of voice did not permit for the existence of an artificial voice. Therefore, the District Court's definition was clearly incorrect. Nothing in Reward Zone's Brief remedies this problem, which means the analysis is back to square one with very little legal authority on the topic, as this is a novel question. Reward Zone's position (i.e. that this Court can simply affirm) cannot possibly be correct.

As Reward Zone's Brief explains, the consensus among the handful of lower courts to have considered the issue seems to be that texts cannot be voices.[3] But

---

[3] *Soliman, DeMesa and Mina* are all cases filed by undersigned counsel. *Soliman* is on appeal, *DeMesa* was not appealed because this action was appealed and intended to address the legal question, and *Mina* was settled during an appeal. None of the decisions conducted a statutory analysis and came up with a definition of voice. *Risher v. Adecco Inc* rejected the notion that a voice could encompass a text message based on a terse statement that it went against common parlance, but again failed to explain what that common parlance definition was, and what that

why?  What is the definition of voice under the TCPA, and what framework of statutory construction is that definition based upon?  This Court will have to decide this issue of first impression, and it is a harder question to answer than it seems at first blush, because the traditional definitions in the dictionary adopted by the District Court do not allow for an artificial voice to even exist.

Reward Zone's strawman argument is that Plaintiff's definition would make it illegal for human-to-human text messages, including a parent texting a friend for a child playdate or a clergy member sending a text to a new congregant.  That is not what Trim has argued at all and is a blatant misrepresentation of the issue.  Trim's argument is that agentless SMS Blasts sent out by computers are artificial.  A text sent by a person to another person is obviously not artificial.  Reward Zone's false dichotomy makes light of a legitimate privacy concern.

---

conclusion was based upon.  It certainly was not based upon dictionary definitions, or other tools of statutory construction.  Rather, the Court seems to have just decided in knee jerk fashion that it did not like the result without an analysis.  Ultimately, none of these authorities help this Court answer the question raised by Trim: what is the definition of voice in the TCPA?  It is insufficient to simply say what it is not, and to analyze this question in broad strokes, because doing so fails to provide an actual definition for a term or apply statutory construction framework to the analysis.  Once a Court employs these tools of statutory interpretation, it will find the question posed is much more difficult, hence why Trim is pressing the issue.

Reward Zone's next position is that "it is clear that sound is required and that text-only is insufficient." This is a fine argument but it is inconsistent with the definitions of "voice" in dictionaries. When engaging in statutory construction, in order to determine the ordinary meaning of a word, consulting common dictionary definitions is the usual course. *Animal Legal Defense Fund v. United States Department of Agriculture*, 933 F.3d 1088, 1093 (9th Cir. 2019); *Cal. All. of Child & Family Servs. v. Allenby*, 589 F.3d 1017, 1021 (9th Cir. 2009).

The District Court adopted a definition in the dictionary which required use of a larynx, syrinx and lungs. But an artificial voice does not use these things, and that definition is therefore plainly inconsistent with the remainder of the statute. *United States v. Pacheco*, 977 F.3d 764, 767-768 (9th Cir. 2020) (In the context of statutory interpretation, whether statutory language is ambiguous does not turn solely on dictionary definitions of its component words; rather, the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole); *Corley v. United States*, 129 S.Ct. 1558, 1566 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

Dictionary.com has seventeen definitions of voice, and only five of them rely on sound, while an equal if not greater number of the definitions permit for non-verbal communications, including the following:

- "something likened to speech as conveying impressions to the mind"

- "expression in spoken or written words, or by other means"

- "an expressed opinion or choice"

- "the person or other agency through which something is expressed or revealed"

*See* https://www.dictionary.com/browse/voice. Merriam Webster's Dictionary defines "voice" as "an instrument or medium of expression." Each of these offer a more plausible alternative than the definition adopted by the District Court. In short, a minority of definitions in the dictionary speak about sound as a required component of "voice" but most of those definitions are, at worst, demonstrably inapplicable to the term artificial voice as used in the TCPA, and at best, at odds with the purpose of the TCPA in a manner which the definitions proposed by Trim are not.

Once dictionaries fail to provide a definitive answer to a plain meaning analysis, we must turn to other portions of the statute to determine which readings permit the statute to flow in harmony with itself. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). As Trim argued in her Opening Brief

(an argument for which Reward Zone has <u>no answer or even response</u>), the definition of an artificial voice axiomatically cannot be man-made, humanly contrived, use lungs, larynx and/or syrinx. Some definitions of voice rely upon sound. Others do not. To assist in further analyzing the issue, the purpose of the statute must be examined. *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1050 (9th Cir. 2018) (overturned on other grounds).[4]

Reward Zone discounts the legislative history offered by Plaintiff in her Opening Brief. There is more history substantiating Trim's position, which has been adopted by this Court, and by the Supreme Court. The extensive history of the TCPA was discussed at length in *Marks*:

> By the early 1990s, telemarketing was in its golden age. Telemarketing sales had "skyrocketed to over $435 million in 1990," which was a "fourfold increase since 1984." 137 Cong. Rec. S16,971 (daily ed. June 27, 1991) (statement of Rep. Pressler). "This marketing success ha[d] created an industry in which over 300,000 telemarketing solicitors call[ed] more than 18 million Americans every day." Id. In part, this was due to the advent of machines that "automatically dial a telephone number and deliver to the called party an artificial or prerecorded voice message." S. Rep. No. 102-178, at 2 (1991). Advertisers found these autodialers highly efficient because they could "ensure that a company's message gets to potential customers in the exact same way, every time, without incurring the normal cost of human intervention." H.R. Rep. No. 102-317, at 6 (1991). At that time, a single autodialer could cause as many as 1,000

---

[4] *Marks* is no longer good law regarding its conclusions about what constitutes an ATDS after *Facebook*, but for purposes of the issues discussed in this brief, it remains good law

REPLY BRIEF         Docket No. 22-55517

phones to ring and then deliver a prerecorded message to each. Id. at 10.

The dark side of this success story caught Congress's attention. As Senator Fritz Hollings complained, "[c]omputerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. S16,205 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings). Recipients deemed that "automated telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons." S. Rep. No. 102-178, at 4. Among other reasons, "[t]hese automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party" and deprive customers of "the ability to slam the telephone down on a live human being." Id. at 4 & n.3 (citation omitted). Congress also noted surveys wherein consumers responded that the two most annoying things were (1) "[p]hone calls from people selling things" and (2) "phone calls from a computer trying to sell something." H.R. Rep. No. 102-317, at 9.

…

Representative Marge Roukema noted that it was "not just calls to doctors' offices or police and fire stations that pose a public health hazard." 137 Cong. Rec. H35,305 (daily ed. Nov. 26, 1991) (statement of Rep. Roukema). She recounted "the sheer terror" of a New York mother who, when she tried to call an ambulance for her injured child, "picked up her phone only to find it occupied by a computer call that would not disconnect." Id. at 35,305–06.

In light of these and other concerns, Senator Hollings introduced a bill to amend the Communications Act of 1934, in order to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers." S. Rep. No. 102-178, at 1. This bill became the Telephone Consumer Protection Act of 1991.

*Id*. at 1043-1044.[5]  In sum, the TCPA's technological prohibitions were enacted to 1) reduce the onslaught of automated telemarketing calls made without consent, 2) prohibit companies from automatically delivering thousands of agentless "computerized" messages to consumers' telephones, 3) interrupting and disturbing consumers with unwanted telemarketing messages, 4) specifically prohibiting artificial and prerecorded messages without a live person due to even heightened invasions of privacy for such calls resulting from the inability to interact with a person who is bothering you and further depriving consumers of the dignity of expressing their frustration, 5) preventing the annoyance of a "computer trying to sell something" through telemarketing communications, 6) protecting public health by preventing consumers telephones from being clogged up with unwanted communications during times when they may need their telephones for other more important reasons, and 7) generally protecting consumer telephone privacy rights. This is not weak legislative history, it is law of the Circuit, which this Court must follow in interpreting the TCPA, just as it must follow *Borden.*  It is also worth mentioning that this same history was outlined in *Facebook*, as well as in *Barr v.*

---

[5] While *Marks* was overturned on other grounds, its recitation of the purpose and history of the TCPA remains law of the Circuit and binding law when it comes to interpreting the text of the TCPA.

REPLY BRIEF                                                    DOCKET NO. 22-55517

*American Association of Political Consultants, Inc.*, 140 S.Ct. 2335, 2344-2345 (2020).

Computerized agentless automated SMS Blaster text messages are identical in almost every way to the communications which gave rise to the TCPA.

An agentless SMS blasted message like the one received by Trim is sent as part of an onslaught of messages sent out in batches without any human involvement, and without consent from the consumer.

An agentless SMS blasted message is computerized, and they "interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of [or in the case of cellular telephones, throw them at] the wall."

Thousands of agentless SMS blasted messages can be sent by computers to thousands of telephones all at once.

Since agentless SMS blasted text messages have nobody on the other end of the telephone, they likewise deprive consumers of the dignity of expressing their frustration at the unwanted calls through human interaction, and are therefore especially bothersome.

Agentless SMS blasted text messages are literally computers trying to sell you something through telemarketing communications.

Agentless SMS blasted text messages clog up our cellular telephone screens by popping up on our phones while we are using those telephones for any number of important things like calling a sick family member, attempting to call a medical facility, making urgent work calls, or millions of other examples of tasks much more important than being annoyed by an unwanted telemarketing communication sent by a computer without consent.

Agentless SMS blasted text messages invade our telephone privacy rights.

The <u>only</u> difference between a telephone call where a computer conveys an artificial auditory message and an SMS blasted telephone call where a computer conveys the same exact message is that one is audible data, while the other is visual data. That is literally the only factual distinction between the two concepts. And so, if this Court agrees that voice is an ambiguous term, which it should because neither the District Court nor any other court has been able to come up with a definition that does not suffer from statutory construction critique, then these policy and purpose issues come into play. And that line comes back into focus, because SMS blasters fit the spirit of the TCPA's artificial voice prohibition much better than does limiting the restriction to purely auditory communications.

Reward Zone completely fails to address this. They want this Court to hold that the statute is unambiguous. But they fail to articulate what the definition of that supposedly unambiguous term "voice" actually is under their framework.

How can the term be unambiguous if neither Reward Zone nor the District Court can adequately define the term?

Reward Zone's arguments relating to FCC regulations are unavailing as well. 47 U.S.C. § 227(d)(3)(B) clearly only regulates telephone calls, not text messages, but the TCPA prohibits both, so drawing conclusions about this narrower regulatory rule that does not regulate text messages is a red herring.

Reward Zone's response to Trim's argument is not based in statutory construction principles. It is a gut reaction to a novel point that has a great deal more merit than Rewards Zone acknowledges in its Brief. This Court must apply statutory construction principles and define voice in a manner which is in harmony with the remainder of the TCPA and its purpose. As a remedial statute, such a definition should be broad, and should serve the purpose of protecting consumer privacy. Whatever that definition ultimately is, doing so should result in the adoption of a standard which includes agentless computerized SMS blasted text messages, because they are identical in every important way to an agentless computerized auditory telephone message.

## CONCLUSION

This Appeal is somewhat late to the party on ATDS, which is a shame because the facts here would have served as a better vehicle to resolve the confusion over what an ATDS is in a post-*Facebook* world. Now, more appeals

REPLY BRIEF                                                      DOCKET NO. 22-55517

will have to be filed to litigate this issue until it can be reviewed by a court that can correct these errors and fix the legal standards. All Trim asks for is an acknowledgement that her arguments have merit, so this fight can continue to be fought for the privacy rights of all Americans.

As to what constitutes an artificial voice, it is clear that the District Court's definition of the term is incorrect. This Court has a blank slate on a novel issue and should apply normal principles of statutory interpretation in defining the term. The only definitions which are consistent with the plain language of the TCPA and its purpose are those which support a broad reading of the term voice, which would include agentless artificial text messages.

Dated: March 16, 2023                         Respectfully Submitted,


                                              BY: /s/ Todd M. Friedman
                                                  TODD M. FRIEDMAN
                                                  ADRIAN R. BACON
                                                  THOMAS E. WHEELER

                                                  ATTORNEYS FOR
                                                  APPELLANT

REPLY BRIEF                                                    DOCKET NO. 22-55517

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED. R. APP. 35(b)(2) and (3)

I certify pursuant to Fed. R. App. P. 35(b)(2) and (3) that the attached Reply Brief for the Appellant Lucine Trim complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) and (3) as it is proportionately spaced, has a typeface of 14 points, and contains 4,433 words.

Dated: March 16, 2023                                Respectfully Submitted,


                                        BY: /s/ Todd M. Friedman
                                            TODD M. FRIEDMAN

                                            ATTORNEYS FOR
                                            APPELLANT

## CERTIFICATE OF SERVICE

I, Todd M. Friedman, certify that on March 16th, 2023, the Appellant's Reply Brief was e-filed through the CM/ECF System, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities. The Court's CM/ECF system sends an email notification of the filing to the parties and counsel of record listed above who are registered with the Court's EMC/ECF system. A copy of the e-filed documents were sent, via the EMC/ECF system:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
JAY T. RAMSEY,
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055

KLEIN MOYNIHAN TURCO LLP
Neil E. Asnen (*pro hac vice*)
450 Seventh Avenue, 40th Floor
New York, New York 10123

**LAW OFFICES OF TODD M. FRIEDMAN**

BY:   /s/ Todd M. Friedman
    Todd M. Friedman, Esq. (SBN 21675)
    21031 Ventura Blvd., Ste. 340
    Woodland Hills, CA 91364
    Phone: (877) 206-4741
    Fax: (866) 633-0228
    Email: tfriedman@toddflaw.com